## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| HILARY BERTAGNOLE HAYS,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>PARK CITY SCHOOL DISTRICT,<br><br>　　　　　Defendant. | **MEMORANDUM DECISION AND ORDER**<br><br>Case No. 2:13-cv-1134-JNP-EJF<br><br>Judge Jill N. Parrish<br>Magistrate Judge Evelyn J. Furse |

Before the court are three pending motions: 1) Plaintiff's Motion for Summary Judgment (Docket 78, 88); 2) Defendant's Motion for Summary Judgment (Docket 87); and Defendant's Motion to Exclude Expert (Docket 74). Also before the court is Defendant's Objection to the Declaration of Hilary Hays (Docket 108). On June 15, 2016, the court held a hearing on all pending motions. The court then took the matter under advisement. After considering the parties' memoranda, the applicable law, and the undisputed material facts, the court DENIES Plaintiff's Motion for Summary Judgment, DENIES IN PART and GRANTS IN PART Defendant's Motion for Summary Judgment, DENIES Defendant's Motion to Exclude Expert, and OVERRULES Defendant's Objection to the Declaration of Hilary Hays.

## BACKGROUND

Plaintiff Hillary Bertagnole Hays ("Hays") first began working for Defendant Park City School District (the "District") as an assistant principal at Park City High School ("PCHS") in August 1998. PCHS is the only high school in the District. In July 2006, Ms. Hays was offered and accepted the position of principal at PCHS. In her appointment letter, the District highlighted an "important caveat" to the interviewing committee's recommendation: "The theme of their

concern was the importance of eliminating occasionally intense emotional overlays from your interactions with students, parents and staff." The letter further "emphasize[d] how important it will be for you to continue to manage the perception of your leadership style during your provisional period," and instructed Ms. Hays to "be a good listener, do not back people into a box, and preserve the personal dignity of those with whom you work."

## I.     The District's Orderly Termination Policy

At all times during her employment with the District, Ms. Hays's employment was governed by the District's Orderly Termination Policy (the "Policy"). Pursuant to the Policy, Ms. Hays began her tenure as principal as a "Provisional Employee."[1] Standard District practice is to retain an employee in a new position on provisional status for the first three years before she is eligible to become a "Career Employee."[2] Once an employee becomes a "Career Employee," she may only be terminated for cause. Causes for which an employee may be terminated "include, but [are] not limited to . . . [u]nsatisfactory performance" and "[u]nprofessional conduct not characteristic of or befitting a Park City School District employee." An employee may also be placed on "Probationary" status if "advised by the district that [her] performance as an employee is inadequate."

---

[1] The Policy defines a "Provisional Employee" as

[a]ny employee who has not achieved career employee status. A provisional employee is hired on an individual, one year contract which may be renewed or not renewed during the initial three years of district employment at the discretion of the Board of Education; except that such employee can be removed during the term of each contract only for cause.

The Policy further states that "provisional status may be extended to either a 4th or 5th year . . . if the employee has not met all requirements to achieve career status within the typical three (3) year time frame."

[2] The Policy defines a "Career Employee" as

any employee of the school district who has obtained a reasonable expectation of continued employment based upon district policy. An employee becomes a career employee upon the successful completion of three consecutive academic school years with the district. . . . Successful completion shall be determined by performance of all contractual duties within standards acceptable to the district.

The procedures for terminating an employee for cause are outlined in Section V of the Policy. Section V.A.1 states, in part,

> If the district intends to terminate a contract during its term or discontinue a career employee's contract beyond the then current school year for reasons of unsatisfactory performance, the unsatisfactory performance must be documented in at least two evaluations conducted at any time within the preceding three years in accordance with this policy.

The Policy also contains a provision mandating that the District conduct an investigation "prior to making a decision to terminate an employee's employment for cause. As part of that investigation, the employee shall be given an opportunity to respond to any and all allegations under investigation."

Under Section V.E of the Policy, the District must also give written notice of its intent to terminate an employee's contract. "The written notice shall state the date of termination and detail the reasons for termination. The notice shall state that the employee has a right to a fair hearing on the matter and will describe the process for requesting a hearing."

Section V.F of the Policy gives employees the right to an informal conference with the superintendent to discuss his decision to terminate the employee's employment. However, the employee's request for a meeting with the superintendent must be in writing and "received by the Superintendent's office no later than five calendar days of receiving notice of termination for cause."

In addition to an informal conference with the superintendent, the Policy also allows the employee to have a hearing on the termination before the Board of Education (the "Board"). This hearing must be requested in writing "within fifteen calendar days of receiving notice of termination for cause." "At the hearing, the employee, administration, and/or the Board, each have a right to counsel, to produce witnesses, to hear testimony, to cross-examine witnesses, and

to examine documentary evidence."

## II.    Performance Evaluations

As a school administrator, Ms. Hays underwent periodic evaluations that were conducted in two parts: (1) a numeric evaluation under the Jordan Administrator Evaluation System ("JAES"); and (2) a written administrative evaluation in letter form. The JAES evaluation assesses performance on a scale of 1 to 4 in 61 categories divided among six separate domains: leadership, judgment, interpersonal skills, instructional program, resource management, and professional standards. JAES evaluations also include a composite score calculated from the numerical scores received in each of the six domains. Scores for the JAES evaluations are provided by the employee being evaluated, the employee's supervisor, and certified and classified staff. Information obtained in the evaluation process from both staff and parents is voluntary.

The administrative evaluation letter consists of a narrative from the supervisor concerning the employee's performance. Superintendent Ray Timothy, Ms. Hays's supervisor, typically conducts an in-person meeting with each of the principals in the District in conjunction with the administrative letter.

## III.    Ms. Hays's Performance from 2006–2010 and Promotion to Career Employee Status

Prior to the end of the 2008–2009 school year, Ms. Hays received satisfactory performance ratings on her JAES evaluation. For example, at the end of the 2007–2008 school year, Ms. Hays "Met Standard" in her overall JAES evaluation.

On March 3, 2009, Ms. Hays attended a collaboration meeting with various members of the PCHS faculty and staff. Collaboration meetings were used by PCHS to discuss the needs of specific students. During this particular meeting, Ms. Hays criticized comments made by a staff

member concerning the number of teaching assistants at the school. Some witnesses characterized Ms. Hays's comments as a "rant," although Ms. Hays disputes this description.

The District investigated Ms. Hays's behavior at the March 2009 collaboration meeting. Ms. Hays ultimately wrote a letter of apology to Superintendent Timothy and to the attendees of the meeting and admitted that her behavior during the meeting was unprofessional.

At the end of the 2008–2009 school year, Ms. Hays received lower scores in certain domains on the JAES evaluation and received an overall rating of "Did Not Meet Standard." In his administrative evaluation letter, Superintendent Timothy reiterated the language in Ms. Hays's appointment letter, warning her of "the importance of eliminating occasionally intense emotional overlays from your interactions with students, parents and staff." Superintendent Timothy further noted in the letter that Ms. Hays's JAES evaluation "reflects many of those same concerns as expressed by certificated staff, classified staff, and parents." And Superintendent Timothy stated, "I have also had parents and staff members meet with me individually to discuss similar concerns." According to Ms. Hays, Superintendent Timothy never provided her with the names of the individuals with whom he met in connection with Ms. Hays's evaluations or any of the concerns that the individuals raised. And as of the date of his deposition, Superintendent Timothy could not remember the specifics of any of the complaints, aside from those arising from the March 2009 collaboration meeting.

Ms. Hays's 2008–2009 administrative evaluation letter extended her provisional employee status for an additional year with the direction to remediate her behavior. Specifically, Superintendent Timothy directed Ms. Hays to work on improving "Personal Relationships; Public/Parent Perceptions and Confidence; Communication; and Staff Morale."

At the end of the 2009–2010 school year, Ms. Hays received an overall rating of "Met

Standard" in her 2009–2010 JAES evaluation. Superintendent Timothy testified that Ms. Hays

had shown "tremendous improvement" during the 2009–2010 school year. As a result of Ms.

Hays's improvement, Ms. Hays was promoted to "Career Employee" status. According to

Superintendent Timothy, this promotion would not have occurred had Ms. Hays not met the

District's expectations.

**IV.     Ms. Hays's Performance from 2010–2011 and Placement on Probationary Status**

On September 3, 2010, Ms. Hays attended a collaboration meeting during which PCHS

faculty and staff discussed disciplinary problems regarding a specific student. Ms. Hays shared

information about the student that she had learned through her personal relationship with the

student's family and expressed concern about the family's decision to send the student to a

wilderness academy. Although Ms. Hays admitted that she "probably shouldn't have said that,"

she later testified that that "I don't think it was unprofessional of me to say it" because"[t]o say

things about students and their environment in that meeting was exactly what that meeting was

about." Following the September 3 collaboration meeting, Ms. Hays sent an email to those

present at the meeting and asked them to keep the matters discussed in the collaboration meeting

confidential. Ms. Hays added, "[I]f we don't[,] it won't be a safe place for us to implement

interventions."

In response to complaints made about Ms. Hays's comments at the September 2010

collaboration meeting, Superintendent Timothy instructed Tim McConnell, the District's director

of human resources, to conduct an investigation. No adverse job actions were taken against Ms.

Hays following the District's investigation of the September 2010 collaboration meeting.

At the end of the 2010–2011 school year, Ms. Hays received an overall rating of "Met

Standard" in the 2010–2011 JAES evaluation. But in a June 2011 meeting with Ms. Hays,

Superintendent Timothy expressed concerns about Ms. Hays's "interpersonal relationships . . . erratic behavior and emotional anger during meetings." Superintendent Timothy informed Ms. Hays that he had received a number of complaints regarding her behavior. Ms. Hays asked for specifics regarding the complaints but Superintendent Timothy would not provide examples of incidents or the identities of the complainants. When Ms. Hays pressed Superintendent Timothy for specifics, he stated, "This is, you know, what—the feedback I'm getting."

Ms. Hays also attended a follow-up meeting with Superintendent Timothy in July 2011. During either the June or July meetings, Ms. Hays remembers Superintendent Timothy holding a black binder that appeared to contain information about complaints individuals had made concerning Ms. Hays. But Superintendent Timothy did not give Ms. Hays any specific details about these complaints.

On September 7, 2011, Superintendent Timothy met with Ms. Hays and gave her his 2010–2011 administrative evaluation letter. In the letter, Superintendent Timothy states that "an extremely large number of staff members and parents have come forward concerned about your behaviors and the way you treat others." Specifically, he outlined the following concerns individuals had with Ms. Hays:

- Inability to refrain from extreme emotional reactions;
- Demonstrations of extreme anger during meetings;
- Publicly reprimanding or dressing down staff members in front of parents and/or peers;
- Creating a climate of tension or toxicity;
- Creating an environment of fear where staff members are afraid to speak out or express their own opinion for fear of losing their jobs;
- A pattern of erratic behavior;
- Mood swings;
- Lack of trust because they don't know if they will get the 'Good' or 'Bad' Hilary;
- Unpredictable. People do not want to approach her;
- Inconsistent with the way she responds to people; and
- Abusive.

The letter did not identify the instances that gave rise to these concerns or the individuals that made these complaints. Nor did Superintendent Timothy provide Ms. Hays with this information.

Superintendent Timothy's letter further stated, "These types of behaviors have caused many to question your overall health and well-being." And Superintendent Timothy warned Ms. Hays that "[s]uch conduct is considered to be unprofessional and not characteristic of or befitting a Park City School District employee. Any further similar conduct may be considered insubordinate and may lead to adverse employment action, including termination."

As a result of these concerns, the District placed Ms. Hays on "'Probationary Status' with the expectation of elimination of these negative behaviors." Ms. Hays notified Superintendent Timothy, both verbally during the September 7 meeting and in writing after, that she objected to any adverse action being taken on the basis of "unprofessional conduct" without being notified of the identities of complainants, the substance of the conduct, and other circumstances.

## V.      Coaching with Mr. Frost

In August 2011, Ms. Hays agreed to work with a consultant to address the areas of concern outlined in her 2010–2011 administrative evaluation letter. The consultant, Tim Frost, used a survey that evaluates sixteen categories on a scale of 1 to 9 (the "Survey"). Mr. Frost told Superintendent Timothy that a veteran administrator should achieve a composite score of 8 on the Survey. But Mr. Frost did not characterize this score as a pass/fail threshold. And Superintendent Timothy did not meet with Ms. Hays to talk about his expectations of her score on the Survey prior to its administration.

Mr. Frost's methodology called for the administration of the survey to PCHS employees at the beginning and end of the coaching period in order to measure Ms. Hays's improvement. The coaching period was to run from November 2011 to March 2012.

Ms. Hays had an opportunity to review and provide input on the Survey questions prior to its administration. The Survey was subsequently administered to approximately 80 PCHS employees in November 2011. The Survey results reflected a composite score of 5.68. Superintendent Timothy was concerned about Ms. Hays's low performance on the Survey. But Superintendent Timothy never communicated his concerns to Ms. Hays.

Using the results from the November 2011 Survey, Mr. Frost helped Ms. Hays establish goals for the remainder of the school year to help Ms. Hays improve her overall score. But neither Mr. Frost nor Superintendent Timothy told Ms. Hays that she needed to score an 8 on the Post-Consulting Survey in order to retain her position as principal.

Following the November 2011 Survey, Ms. Hays worked with Mr. Frost and implemented his suggestions in order to improve her overall score. During this time, Ms. Hays did not attend collaboration meetings. Ms. Hays contends that she discontinued going to these meetings in order to address technology concerns at PCHS.

**VI.    The December 2011 Cheerleader Incident**

On December 14, 2011, Ms. Hays was involved in an incident regarding inappropriate behavior by a cheerleader. The cheerleader had allegedly exposed herself to other students. Ms. Hays met with the cheerleader and asked her about her behavior. Ms. Hays confirmed the facts of the cheerleader's behavior with other witnesses and surveillance video and discussed them with the cheerleader. Ms. Hays called the cheerleader back to her office and notified the girl that because this was a repeat offense she would be placed in in-school suspension while Ms. Hays contacted the cheerleader's parents.

The cheerleader left in-school suspension without permission later that day and returned to Ms. Hays's office. Upon arriving at Ms. Hays's office, the cheerleader was very loud. Ms.

9

Hays instructed the cheerleader to sit down while Ms. Hays met with other students. The cheerleader began yelling and screaming, at which point Ms. Hays repeated her directions to the cheerleader in a much louder tone so that the cheerleader could hear Ms. Hays's instructions. The cheerleader eventually complied with Ms. Hays's instructions.

When Ms. Hays met with the cheerleader, the cheerleader "was absolutely losing it" and threatened to leave. Ms. Hays wanted to prevent the cheerleader from leaving while she was upset, and said, "I rose my voice over hers so she could hear me say, I cannot just let you leave. I need to call your parents." Ms. Hays later testified that "the last thing you ever want to have happen is a student who's that upset walk out of your office, get in the car, and leave your school. I mean, I couldn't think of a worse thing." Despite this, the cheerleader left.

Ms. Hays informed Superintendent Timothy of these events. Superintendent Timothy met with the cheerleader's parents and later told Ms. Hays that she had done the right thing but that he was concerned about "the manner in which [Ms. Hays] treated the girl" based on a report he received from a vice principal at PCHS, Lyndsay Anderson Huntsman. Ms. Huntsman was present for some, but not all, of Ms. Hays's interactions with the cheerleader.

Following the December 2011 cheerleader incident, Superintendent Timothy directed another assistant principal, David McNaughton, to investigate Ms. Hays's conduct. Mr. McNaughton concluded that "Ms. Hays more than likely told [the student] to be quiet and leave her office."

Superintendent Timothy contends that the December 2011 cheerleader incident contributed to his decision to terminate Ms. Hays's employment. But the incident did not result in any adverse job action concerning Ms. Hays at the time it happened. Unlike the 2009 and 2010 collaboration meeting incidents after which Ms. Hays issued apology letters, Ms. Hays was

not asked to respond to the December 2011 cheerleader incident in any way. In addition, Ms. Hays first became aware of the December 2011 cheerleader incident as a basis for termination at her post-termination administrative hearing. The December 2011 cheerleader incident is not mentioned in Ms. Hays's termination letter.

## VII.   Post-Consulting Survey

Later in the 2011–2012 school year, Superintendent Timothy informed Ms. Hays that she would not be evaluated using JAES. Instead, Superintendent Timothy told Ms. Hays that her performance would be evaluated based on the Post-Consulting Survey Mr. Frost administered in March 2012 at the end of Ms. Hays's coaching period with Mr. Frost.

Ms. Hays never asked Mr. Frost or Superintendent Timothy what score was expected of her on the Post-Consulting Survey. Instead, it was Ms. Hays's assumption that the grading under the Post-Consulting Survey would be similar to the JAES evaluation, in which a score of 75% or higher was acceptable. During the coaching period, Superintendent Timothy never brought any performance deficiencies to Ms. Hays's attention.

Ms. Hays's received a composite score of 6.91 out of 9, or 77%, on the March 2012 Post-Consulting Survey. Although Ms. Hays still received negative views in the "visibility" category, many of the participants in the Post-Consulting Survey acknowledged Ms. Hays's improved performance.

Approximately one week after Mr. Frost administered the Post-Consulting Survey, Superintendent Timothy met with Mr. Frost to discuss Ms. Hays's results. Mr. Frost was very complimentary of Ms. Hays's progress and was agreeable to continuing to work with her.

## VIII.   Termination Decision

Despite Ms. Hays's improvement on the Post-Consulting Survey, Superintendent

Timothy was undecided about whether to terminate Ms. Hays's employment. Superintendent Timothy stated that "just because she scored below an 8 didn't mean that that was going to be cause for her termination . . . so the results of getting less than an 8—it wasn't the trigger or it didn't flip the switch for termination."

On April 18, 2012, Ms. Hays sent Superintendent Timothy an email with a number of statements from faculty and staff at PCHS that indicated support for Ms. Hays. Superintendent Timothy discounted the statements and elected not to talk to the individuals who made them, believing that Ms. Hays had intimidated the individuals into supporting her. The next day, Superintendent Timothy met with Ms. Hays and told her he had not yet made a decision regarding her employment status.

Superintendent Timothy also testified that he had a "continual parade of staff [coming] in, complaining" about Ms. Hays. Yet he cannot remember which staff members came to him or what they said about Ms. Hays. Despite this, Superintendent Timothy testified that these complaints led him to terminate Ms. Hays's employment. Specifically, Superintendent Timothy stated that his decision was driven in part by a comment that he remembered from an individual who stated that "if a teacher treated a student this way, or if a coach treated an athlete this way, we would terminate them."

Superintendent Timothy made his decision to not renew Ms. Hays's contract with the District sometime during the end of April or early May. In addition to the "continual parade of complaints," Superintendent Timothy stated that he considered many factors in making his decision, including the fact that Ms. Hays had failed to achieve an 8 out of 9 on the Post-Survey. Superintendent Timothy also testified that he decided to terminate Ms. Hays's employment because her behavior had not improved to his expectations and that allowing her to remain as

principal would have been detrimental to the PCHS.

## IX.    Termination Process

Ms. Hays met with Superintendent Timothy on May 3, 2012. At the May 3 meeting,

Superintendent Timothy informed Ms. Hays that he had decided to terminate her employment.

He also explained to Ms. Hays that in order to protect her reputation, she could resign, be cut in a

reduction in force, or be terminated for cause. Ms. Hays asked for some time to think about her

options and agreed to meet with Superintendent Timothy the following week.

On May 6, 2012, a Board member told a faculty member at PCHS that Ms. Hays's

employment had been terminated. As a result, Ms. Hays felt that she had no choice but to request

that she be terminated for cause. The following day, Ms. Hays notified Superintendent Timothy

that she wished to be terminated for cause.

Superintendent Timothy sent Ms. Hays a termination letter on May 8, 2012. The letter

stated Ms. Hays was being terminated for failing to achieve an 8 out of 9 on Mr. Frost's Post-

Consulting Survey. In the letter, Superintendent Timothy also expressed concern about

comments made by teachers who completed the survey that "still express[ed] a lack of trust in

you as their leader." The letter further states,

> [B]ecause I have not seen the level of improvement that I believe necessary for
> you to continue in your current position, it is my conclusion that there needs to be
> a change of leadership at Park City High School. Accordingly, you are hereby
> given notice that your employment with the Park City School District *is
> terminated for cause* effective July 30, 2011 [sic]. The cause for termination is
> conduct considered to be unprofessional and not characteristic of or befitting a
> Park City School District employee.

Aside from referring to a "pattern of conduct" starting with the 2009–2010 school year, and

"similar concerns brought to [Ms. Hays's] attention at the end of the 2011 school year," the letter

does not itemize instances or provide examples of Ms. Hays's "unprofessional conduct."

The letter also informed Ms. Hays of her right to appeal the District's decision and her right to request an informal conference with the superintendent. In addition, the letter informed Ms. Hays that her request for a due process hearing before the Board must be submitted in writing by May 23, 2012.

The parties dispute whether Ms. Hays or Superintendent Timothy requested or arranged for an informal meeting with each other. Ultimately, Superintendent Timothy and Ms. Hays met on May 24, 2012. Superintendent Timothy used the May 24 meeting to offer a settlement agreement, not to discuss the basis of Ms. Hays's termination. Ms. Hays further contends that at the May 24 meeting she had no opportunity to object to her termination.

Ms. Hays also requested a formal hearing before the Board, which was held on August 9, 2012, after her termination became effective on July 30, 2012. During the hearing, Ms. Hays was represented by counsel. Ms. Hays, through her counsel, was allowed to cross-examine witnesses and present legal arguments, as was the District's counsel. Ms. Hays was also allowed to call witnesses, although the Board did not allow her expert witness to testify. But Ms. Hays contends that she was not given sufficient advance notice before the hearing of the District's claims, documentary evidence, or witnesses to know what witnesses to call in order to rebut the District's position. Ms. Hays further asserts that she was confronted by testimony from several individuals whose identity and testimony had not been disclosed to her prior to the hearing.

Because Ms. Hays was not given advance notice of the District's claims, evidence, and witnesses, the post-termination hearing before the Board was continued until September 10, 2012. During this time, Ms. Hays was only provided with Superintendent Timothy's notes. She was not given any other information concerning testimony that would be forthcoming in the September 10 hearing.

The hearing continued on September 10, resumed on September 20, and concluded on September 21. Following the conclusion of the hearing, the Board issued its "Findings of Fact and Conclusions of Law." In its decision, the Board upheld the District's decision to terminate Ms. Hays's employment. As part of the Board's findings, the Board identified four instances in which Ms. Hays engaged in unprofessional behavior: the December 2011 cheerleader incident, a confrontation with an outside delivery person, failing to listen to her assistant principal during a scheduling meeting, and an incident during a meeting at which Ms. Hays allegedly mocked another teacher. As a result of these instances and other evidence presented, the Board determined that Ms. Hays had failed to "eliminate . . . enumerated negative behaviors."

Ms. Hays has not been employed since her termination became effective on July 30, 2012. Because she was terminated for cause, Ms. Hays alleges that has been precluded from being considered for other educational positions in the area.

## X.   Case Proceedings

In December 2013, Ms. Hays filed a complaint against the District, Dr. Conley, and Superintendent Timothy in Utah state court, asserting eight causes of action. Defendants subsequently removed the case to this court. (Docket 1). In August 2014, the court granted Defendants' motion to dismiss, dismissing the claims against Dr. Conley and Superintendent Timothy, as well as Ms. Hays's state constitutional law claims. In February and March 2016, Ms. Hays and the District filed cross-motions for summary judgment on the remaining claims: (1) breach of contract; (2) violation of the Orderly School Termination Procedures Act, Utah Code § 53A-8a-501; (3) violation of Ms. Hays's substantive due process rights under the Fourteenth Amendment to the U.S. Constitution; and (4) violation of Ms. Hays's procedural due process rights under the Fourteenth Amendment to the U.S. Constitution.

## XI.   Ms. Hays's Expert Witness

Ms. Hays designated Dr. M. Donald Thomas as an expert witness. Dr. Thomas has a
Doctorate of Education and has served as superintendent of schools across the United States and
as the U.S. Department of Education's Representative to Japan. He was the State Accountability
Officer in South Carolina from 1984 to 1987. Since 1987, Dr. Thomas has been the president of
School Management Services, International Education Consulting Firm. Dr. Thomas has
published books on the performance evaluation of educational personnel and other school
administration topics.

In his report on the termination of Ms. Hays's employment, Dr. Thomas made an
"examination of the record concerning Hilary Hays" and made a "determination . . . about the
validity of the termination of Hilary Hays." Specifically, Dr. Thomas determined that Ms. Hays
achieved the objectives identified in the letter appointing her to be PCHS's principal and that
"[t]he evidence . . . suggests that several items were achieved at a very high level, deserving of
'accolades' because PCHS was "one of the best in the country and the top-rated high schools in
the state of Utah."

Dr. Thomas also analyzed the requested "modification in leadership style," paying
particular attention to the District's concerns about Ms. Hays's "overall health and wellbeing."
But Dr. Thomas determined that because "[n]o one requested a complete physical and/or
psychological examination nor was any professional assistance provided in the health area," that
"[i]t is reasonable to assume . . . that these behaviors were not a serious concern to her
supervisors." In arriving at this conclusion, Dr. Thomas relied on "[p]rofessional ethics."

In addition, Dr. Thomas considered Ms. Hays's termination and examined Ms. Hays's
JAES evaluations, including contradictory scores in the "Professional Standards" domain. Dr.

Thomas could not find any support in the record for these contradictory scores. Dr. Thomas also

considered Superintendent Timothy's actions in conducting an investigation after the 2009 and

2010 collaboration meeting incidents and dealing with the allegations against Ms. Hays. In his

report, Dr. Thomas stated,

> It is generally believed in education bodies that the actions of the superintendent
> are not appropriate at this point. The persons making the allegations should be
> directed to meet with the principal to discuss their concerns and to attempt to
> reach a resolution of the matter. An attempt should first be made to establish a
> resolution "at the lowest possible level."

In support of this contention, Dr. Thomas cited the American Association of School

Administrators "State of Ethics for Educational Leaders" and concluded that the administrators

in the District did not fulfill their obligation to protect the "due process and civil and human

rights of all individuals."

Dr. Thomas also evaluated Mr. Frost's Post-Consulting Survey and it's nine-point Likert

Scale. Dr. Thomas concluded that an "examination of the pre-post data indicate substantial

improvement from a score of 5.87 to a score of 6.91" and that "[a] rating of 6.91 is considered to

be satisfactory by any statistical analysis." But Dr. Thomas highlighted his concern with Mr.

Frost's Survey: "Because there is no distribution group for comparison, we can only assume a

statistical distribution. I cannot find in the record any validation information related to the 8.0

rating, possible three standard deviations from the mean—an extremely unlikely achievement by

any individual."

Further, Dr. Thomas provided a few suggestions to the District on how to improve the

manner in which they give feedback to their administrators, stating that "the use of surveys as

questionnaires are highly questionable." Dr. Thomas also highlighted why "such instruments are

not reliable," and suggested that "[a] much more effective evaluation program for education of

personnel is based on the achievement of results data" or "performance-based evaluations." Dr.

Thomas also stated that "the criteria for success [must] be clearly established at the beginning of

the remediation process," and that the remediation program should identify "what is to be

remediated, how it is to be measured, [the] time period for remediation; and [the] resources

provided for remediation."

Based on the above analysis, Dr. Thomas concluded that Ms. Hays was "unjustly

terminated" and "should be reappointed as Park City High School principal. To do otherwise

constitutes a violation of her property rights and a moral weakness on the part of the [District]."

The District identified no expert witnesses and did not designate reports or counter

reports. Instead, the District moved to exclude Dr. Thomas's expert testimony under Federal Rule

of Evidence 702 (Docket 74).

## ANALYSIS

The court will first address the parties' cross-motions for summary judgment before

turning to the District's motion to exclude Ms. Hays's expert witness.

## I.      Cross-Motions for Summary Judgment

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment

if the movant shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law." A dispute is genuine only if "a reasonable jury could

find in favor of the nonmoving party on the issue." *Macon v. United Parcel Serv., Inc.*, 743 F.3d

708, 712 (10th Cir. 2014). "In making this determination, 'we view the evidence and draw

reasonable inferences therefrom in the light most favorable to the nonmoving party.'" *Id.*

(quoting *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1225 (10th Cir. 2000)).

The parties are cross-moving for summary judgment on each of Ms. Hays's remaining

four claims: (A) breach of contract; (B) violation of the Orderly School Termination Procedures Act, Utah Code § 53A-8a-501; (C) violation of Ms. Hays's substantive due process rights under the Fourteenth Amendment to the U.S. Constitution; and (D) violation of Ms. Hays's procedural due process rights under the Fourteenth Amendment to the U.S. Constitution. The court addresses each of these claims below.

### A. Breach of Contract

Ms. Hays first asserts that the District breached its employment contract with her when the District terminated her employment. In Utah, a plaintiff must show the following elements in order to recover on a breach of contract claim: "(1) a contract, (2) performance by the party seeking recovery, (3) breach of the contract by the other party, and (4) damages." *Bair v. Axiom Design, L.L.C.*, 20 P.3d 388, 392 (Utah 2001).

The parties agree that a contract existed between them and that Ms. Hays's employment contract incorporated the Policy. The parties further agree that Ms. Hays qualified as a "career employee" under the Policy, which meant that her employment could only be terminated for cause and consistent with the procedures outlined by the Policy. But the parties dispute whether the District breached the terms of the contract when the District terminated Ms. Hays's employment. Ms. Hays argues that (1) the District failed to follow the investigation procedure mandated by the Policy; (2) the District terminated Ms. Hays's employment without cause; and (3) the District terminated Ms. Hays's employment without documenting unsatisfactory performance in two or more evaluations during the three years before her termination.

### 1. The Policy's Investigation Procedures

First, Ms. Hays argues that the District failed to follow the pre-termination investigation procedure mandated by the Policy. Section V.A.2 of the Policy states that the District "will

ensure that an investigation will be conducted prior to making a decision to terminate an employee's employment for cause. As part of that investigation, the employee shall be given an opportunity to respond to any and all allegations under investigation."

Ms. Hays argues that none of the complaints concerning her performance were brought to her attention before the District made its decision to terminate her employment. Ms. Hays further contends that she was not given "an opportunity to respond to any and all allegations under investigation" before the District made its decision. Conversely, the District argues that Ms. Hays acted unprofessionally in three incidents—the 2009 and 2010 collaboration meetings and the December 2011 cheerleader incident—and that the District investigated these incidents and gave Ms. Hays an opportunity to respond to the allegations against her. The District also argues that Ms. Hays was given an opportunity to respond after each JAES evaluation she received and Mr. Frost's Post-Consulting Survey. Because of this, the District argues that Ms. Hays had notice of and an opportunity to respond to "her pattern of behavior."

The court concludes that there are disputes of material fact as to whether the District's actions qualified as an "investigation . . . prior to making a decision to terminate an employee's employment for cause" under Section V.A.2 of the Policy. Specifically, there are factual disputes as to whether the Post-Consulting Survey, the JAES evaluations, and the investigations in connection with the three incidents were adequate under the Policy. The District maintains that it performed a number of "investigations" after the 2009 and 2010 collaboration meetings and the December 2011 cheerleader incident, as well as through evaluations and a Post-Consulting Survey. The District further maintains that Ms. Hays was always given an opportunity to respond to the results and findings of those evaluations and investigations. Ms. Hays contends that these "investigations" are not the type of "investigation" the Policy requires and that she did not have

an opportunity to respond to all of the allegations that led to the eventual decision to terminate her employment. Because there are disputes of fact regarding the adequacy of the "investigations" undertaken by the District, the court denies the parties' motions for summary judgment on Ms. Hays's breach of contract claim with respect to the Section V.A.2 of the Policy.

## 2.    For Cause Termination

Second, Ms. Hays argues that the District terminated Ms. Hays's employment without cause. Section V.A.1 of the Policy "defines causes under which a contract shall not be renewed, under which the contract of each class of personnel shall not be renewed, and under which a contract can be otherwise terminated during the contract term." Those causes include "Unsatisfactory performance" and "Unprofessional conduct not characteristic of or befitting a Park City School District employee." Section V.E of the Policy further states, "If the district intends to terminate an employee's contract during the contract term, the district shall give written notice of that intent to the employee. . . . [T]he written notice shall state the date of termination and detail the reasons for termination."

Ms. Hays argues that her termination was not the result of "cause" as defined by the Policy, but rather was the result of negative responses to a "popularity survey"—Mr. Frost's Post-Consulting Survey. In addition, Ms. Hays points out that the "cause" identified by Superintendent Timothy in Ms. Hays's termination letter—"conduct considered to be unprofessional and not characteristic of or befitting a Park City School District employee"—does not match up with the reasons for termination outlined in the termination letter. Conversely, the District argues that its actions in terminating Ms. Hays's employment complied with the Policy.

Ms. Hays's termination letter states, "The cause for termination is conduct considered to be unprofessional and not characteristic of or befitting a Park City School District employee."

And the reasons detailed in her letter include her failure to receive a composite score of 8 out of 9 on Mr. Frost's Post-Consulting Survey, Superintendent Timothy's concerns about "the number of comments still expressing a lack of trust in you as their leader," Ms. Hays's pattern of unprofessional conduct starting in 2009, and Superintendent Timothy's conclusion that Ms. Hays had not achieved "the level of improvement that [he] believe[d] necessary for [her] to continue" as principal. The letter does not detail any incidents—including the 2009 and 2010 collaboration meetings, as well as the December 2011 cheerleader incident—that were later either investigated or later identified as reasons for terminating Ms. Hays.

Ms. Hays's termination letter clearly states the "for cause" reason leading to her termination—"conduct considered to be unprofessional and not characteristic of or befitting a Park City School District employee." And this reason is clearly identified as a legitimate cause for termination under the Policy. But there are factual disputes and contradictory evidence as to whether the reason stated in the termination letter was the actual reason for Ms. Hays's termination and whether the actual reason for her employment constituted adequate "cause" under the Policy. Ms. Hays points to the fact that the reasons for termination outlined in the termination letter do not match up with a charge of "conduct considered to be unprofessional and not characteristic of or befitting a Park City School District employee." The District counters that the termination letter and its reason for terminating Ms. Hays's employment complies with the Policy, even absent details of any incidents. Because the court concludes that genuine factual disputes exist as to this issue, it therefore denies the parties' motions for summary judgment on Ms. Hays's breach of contract claim with respect to Section V of the Policy.

### 3.    Documentation of Unsatisfactory Performance

Third, Ms. Hays argues that the District terminated her employment without documenting

unsatisfactory performance in two or more evaluations during the three years preceding her

termination. Section V.A.1 of the Policy states,

> If the district intends to terminate a contract during its term or discontinue a career
> employee's contract beyond the then current school year for reasons of
> unsatisfactory performance, the unsatisfactory performance must be documented
> in at least two evaluations conducted at any time within the preceding three years
> in accordance with the policy.

Ms. Hays argues that her termination "ties into nothing specified in two prior

administrative evaluations within three years thereof," and that "it ties to nothing identified in

two JAES evaluations conducted within three years thereof." Although Ms. Hays acknowledges

that she received a negative administrative evaluation at the end of the 2010–2011 school year,

she contends that her 2010–2011 administrative evaluation does not describe the supposed

unprofessional conduct that she needed to change. Ms. Hays also contends that the other negative

evaluation relied upon by the District, Mr. Frost's Post-Consulting Survey, should not be

considered because Ms. Hays did not know what score she needed to achieve on the Post-

Consulting Survey in order to retain her position as principal. Conversely, the District argues that

even though Ms. Hays "met standard" on the JAES evaluations during these years, that Ms.

Hays's low scores in various domains on the JAES evaluations "nevertheless reflected the same

pattern of interpersonal conflict and poor judgment that dogged [Ms. Hays's] tenure."

    As previously discussed, there are disputes of material fact as to the real reason(s) for Ms.

Hays's termination and accordingly there are also disputes of material fact as to whether the

District documented the unsatisfactory performance leading to Ms. Hays's termination in at least

two evaluations within the three years preceding her termination as required by the Policy.

Although the parties agree that the 2010–2011 administrative evaluation letter constitutes a

negative evaluation, the parties disagree as to whether it sufficiently documented unsatisfactory

performance to satisfy Section V.A.1 of the Policy. And the parties further disagree as to whether Mr. Frost's Post-Consulting Survey constitutes an evaluation that shows Ms. Hays's performance was unsatisfactory or whether Ms. Hays's low scores on single questions on the JAES evaluation and pattern of behavior constitutes a documented evaluation. Because there are disputes of material fact as to whether the District adequately documented Ms. Hays's allegedly unsatisfactory performance as principal, the court is precluded from granting summary judgment on Ms. Hays's breach of contract claim with respect to Section V.A.1 of the Policy.

In summary, the court finds that there are disputes of material fact as to whether the District complied with the Policy when it terminated Ms. Hays's employment. The court therefore denies the parties' motions for summary judgment on Ms. Hays's breach of contract claim.[3]

---

[3] In her opposition to the District's motion for summary judgment, Ms. Hays also argues, for the first time, that the District violated the implied covenant of good faith and fair dealing when it terminated her employment. Specifically, Ms. Hays argues that the District's actions in firing her without a reasonable explanation or opportunity to remedy her alleged unprofessional behavior deprived her of the agreed-upon benefits of her employment agreement with the District.

Conversely, the District argues that Ms. Hays should be precluded from raising this argument now because Ms. Hays did not plead breach of the implied covenant of good faith and fair dealing as a claim separate from her breach of contract claim. Specifically, the District contends that "[t]he Utah Supreme Court has consistently and without exception recognized that a breach of contract claim is separate and distinct from a claim for a breach of the covenant of good faith." The only case the District cites in support of this proposition is *Christiansen v. Farmers Ins. Exch.*, 116 P.3d 259, 261–62 (Utah 2005). But Nowhere does that case specifically articulate that breach of contract claims are "separate and distinct" from claims for a breach of the covenant of good faith and fair dealing.

In Utah, "all contracts contain a covenant of good faith and fair dealing." *Berube v. Fashion Centre, Ltd.*, 771 P.2d 1033, 1046 (Utah 1989). Under this covenant, "each party impliedly promises that he will not intentionally or purposely do anything which will destroy or injure the other party's right to receive the fruits of the contract." *St. Benedict's Dev. Co. v. St. Benedict's Hosp.*, 811 P.2d 194, 199 (Utah 1991). The Utah Supreme Court has held that "[a] violation of the covenant gives rise to a claim for breach of contract." *Id.* at 200.

Contrary to the District's assertion that Ms. Hays never articulated her breach of the implied covenant of good faith and fair dealing claim, Ms. Hays's complaint alleges sufficient facts to indicate that such a claim was at issue. In her breach of contract claim, Ms. Hays's alleges that the District breached its employment contract with her "[b]y terminating Plaintiff's employment without specific, articulated cause, and without giving advance notice to Plaintiff in connection therewith, and by imposing undisclosed and changing standard on her performance despite her completion of [a] remediation program to the satisfaction of the consultant." The allegation that the District "impos[ed] undisclosed and changing standard[s]" raises the claim that the District breached its contract with Ms. Hays by breaching an implied promise not to "intentionally or purposely do anything which will destroy or injure the other party's right to receive the fruits of the contract." *Id.* at 199.

**B.      Orderly Termination Act, Utah Code § 53A-8a-501**

Ms. Hays asserts that her termination violated the Orderly Termination Act, Utah Code

§ 53A-8a-501. Specifically, Ms. Hays argues that (1) her remediation plan did not comport with

the requirements of Utah Code § 53A-8a-501(3), and (2) her termination did not comport with

the steps outlined in Utah Code § 53A-8a-503(1)(a)–(e). Each of these arguments is addressed

below.

**1.      Remediation under Utah Code § 53A-8a-501(3)**

First, Ms. Hays argues that the remediation plan afforded to her by the District did not

comport with the requirements of Utah Code § 53A-8a-501(3). Under Utah Code § 53A-8a-

501(1), "A local school board shall, by contract with its employees or their associations, or by

resolution of the board, establish procedures for dismissal of employees in an orderly manner

without discrimination." These procedures must include "procedures and standards related to

developing and implementing a plan of assistance for a career employee whose performance is

unsatisfactory." *Id.* § 501(2)(c). This plan of assistance must identify "(a) specific, measurable,

and actionable deficiencies; (b) the available resources provided for improvement; and (c) a

course of action to improve employee performance." *Id.* § 501(3).

Ms. Hays argues that the District's "remediation program"—her four month coaching

period with Mr. Frost—did not identify "specific, measurable, or actionable deficiencies in her

conduct." Instead, Ms. Hays argues that the District told her to "follow verbal directives from

Mr. Frost in hopes of improving her scores on a subjective, immeasurable popularity survey

administered before and after her remediation period, in order to meet a numerical goal never

shared with her." Conversely, the District argues that the surveys used by Mr. Frost "use[] the

---

Accordingly, Ms. Hays's claim for breach of the implied covenant of good faith and fair dealing, a subset of
her breach of contract claim, is properly before the court. Because neither party moved for summary judgment on
this claim, it remains to be resolved at trial.

same methodology as the JAES evaluations upon which [Ms. Hays's] performance had been measured throughout her career with" the District, and that despite Ms. Hays's expert's contentions, the surveys used by Mr. Frost should be considered because of their similarities to the JAES evaluations. The District also argues that the consulting program with Mr. Frost provided Ms. Hays a "very specific course of action for improvement."

The court finds that there are disputes of material fact as to whether the "remediation program" that the District provided to Ms. Hays meets the requirements of § 501(3). The parties dispute whether the coaching Ms. Hays received from Mr. Frost identified "specific, measurable, and actionable deficiencies" that Ms. Hays needed to improve in order to retain her job. The District argues that the Ms. Hays's consulting period with Mr. Frost provided Ms. Hays with a resource and course of action to improve her performance, and that his surveys, which were similar to the JAES evaluations, provided Ms. Hays with "specific, measurable, and actionable" feedback on her deficiencies. Yet Ms. Hays maintains that the feedback given to her through Mr. Frost's surveys did not identify "specific, measurable, and actionable deficiencies" and that Mr. Frost's coaching never provided her with any specific feedback on how she could improve her performance.

These facts are material to determining whether the District complied with § 501(3). And a reasonable jury could find for either Ms. Hays or the District in determining whether Ms. Hays's coaching period with Mr. Frost met the requirements mandated by § 501(3). Accordingly, the court denies summary judgment on Ms. Hays's § 501(3) claim.

### 2. Termination Process Under Utah Code § 53A-8a-503(1)(a)–(e)

Ms. Hays next argues that her termination did not comport with the steps outlined in Utah Code § 53A-8a-503(1)(a)–(e). Under Utah Code § 53A-8a-503(1),

If a district intends to not renew a career employee's contract for unsatisfactory performance or terminate a career employee's contract during the contract term for unsatisfactory performance, the district shall:

    (a)    provide and discuss with the career employee written documentation clearly identifying the deficiencies in performance;

    (b)    provide written notice that the career employee's contract is subject to nonrenewal or termination if, upon a reevaluation of the career employee's performance, the career employee's performance is determined to be unsatisfactory;

    (c)    develop and implement a plan of assistance, in accordance with procedures and standards established by the local school board under Section 53A-8a-501, to allow the career employee an opportunity to improve performance;

    (d)    reevaluate the career employee's performance; and

    (e)    if the career employee's performance remains unsatisfactory, give notice of intent to not renew or terminate the career employee's contract in accordance with Subsection 53A-8a-502(5).

The District argues that it followed all five steps required by § 503(1). Specifically, the District contends that Ms. Hays's 2010–2011 administrative evaluation fulfilled subsections (a) and (b), the Mr. Frost consulting period fulfilled subsection (c), the Post-Consulting Survey fulfilled subsection (d), and that the May 8, 2012 termination letter fulfilled subsection (e). Conversely, Ms. Hays argues that the 2010–2011 administrative evaluation letter is insufficient to meet subsection (a) because it did not provide her with any specific details "clearly identifying the deficiencies in performance." Instead, Ms. Hays contends that her "'unsatisfactory performance' consisted of nothing but whispered anecdotes" that were never communicated to her. Ms. Hays further contends that Mr. Frost's consulting program is insufficient to meet subsection (c), for the same reasons articulated in her § 501(3) arguments. And Ms. Hays argues that the District failed to meet subsections (d) and (e) when it fired her for failing to achieve an 8 out of 9 on Mr. Frost's Post-Consulting Survey, a score that the District admits it never told Ms. Hays she had to achieve in order to retain her employment.

There are disputes of material fact as to whether the District complied with § 503. A

reasonable jury could determine that Ms. Hays's 2010–2011 administrative evaluation provided her with details "clearly identifying the deficiencies in performance." Or a reasonable jury could determine that the description of Ms. Hays's conduct in the 2010–2011 administrative evaluation was not specific enough to meet the requirements of § 503(1). And as detailed above, reasonable minds could differ on whether Mr. Frost's consulting program satisfied subsection (c) and whether the District gave Ms. Hays an opportunity to improve her performance. Reasonable minds could also differ on whether the District's failure to tell Ms. Hays that she needed to achieve an 8 out of 9 on the Post-Consulting Survey precludes the District from satisfying § 503(1)(e). Thus, the court denies the parties' motions for summary judgment on Ms. Hays's § 503(1) claim because there are disputes of material fact.

Because there are disputes of material fact concerning the District's compliance with the Orderly Termination Act, Utah Code § 53A-8a-501 & 503, the court denies the parties' cross-motions for summary judgment.

### C.    Substantive Due Process

Ms. Hays asserts that her termination violated her substantive due process rights under the Fourteenth Amendment to the Constitution. The Fourteenth Amendment protects an individual's interest in deprivations from "life, liberty, or property, without due process of law." "A public employee with a property interest in continued employment has a substantive-due-process right not to be terminated for arbitrary or capricious reasons." *Darr v. Town of Telluride*, 495 F.3d 1243, 1257 (10th Cir. 2007).

"The standard for judging a substantive due process claim is whether the challenged government action would 'shock the conscience of federal judges.'" *Tonkovich v. Kan. Bd. of Regents*, 159 F.3d 504, 528 (10th Cir. 1998) (quoting *Uhlrig v. Harder*, 64 F.3d 567, 573 (10th

Cir. 1995)). In order to meet this standard, "a plaintiff 'must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking.'" *Id.* (quoting *Uhlrig*, 64 F.3d at 574). Thus, "'the threshold question is whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'" *Id.* (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 848 n.8 (1998)); *see also Darr*, 495 F.3d at 1257 ("[A] substantive-due-process claim, if viable, requires assessing whether a governmental action is arbitrary, irrational, or shocking to the contemporary conscience."). "Because the conscience-shocking standard is intended to limit substantive due process liability, it is an issue of law for the judge, not a question of fact for the jury." *Perez v. Unified Gov't of Wyandotte Cty.*, 432 F.3d 1163, 1168 n.4 (10th Cir. 2005) (quoting *Terrell v. Larson*, 396 F.3d 975, 981 (8th Cir. 2005)).

As a "career employee," Ms. Hays had "a reasonable expectation of continued employment based upon district policy" and could only be terminated "for cause." Thus, Ms. Hays had a substantive due process right to continued employment. *See Tonkovich*, 159 F.3d at 528. But Ms. Hays has failed to show that the District's conduct violated her right to continued employment in a manner that "is truly conscience shocking." *See id.* (quoting *Uhlrig*, 64 F.3d at 574).

Ms. Hays argues that the District terminated her employment "on the basis of comments made by co-workers whose names [Superintendent Timothy] could not recall, making vague charges which he never shared with Hays." Further, Ms. Hays asserts that Superintendent Timothy's decision was based on achieving an 8 out of 9 on Mr. Frost's Post-Consulting Survey—a standard that Superintendent Timothy never told Ms. Hays that she needed to achieve in order to retain her employment. Further, Ms. Hays contends that the District engaged in

arbitrary and capricious conduct when it fired her based on a single comment that "if a teacher treated a student this way, or if a coach treated an athlete this way, we would terminate them."

Yet these facts, if true, are insufficient to meet the "conscience-shocking" standard. "This standard is exceedingly difficult to meet, a fact underscored by the cases in which courts have declined to find a violation of substantive due process rights under substantially more egregious allegations than presented by [Ms. Hays]." *Seabourn v. Ind. Sch. Dist. No. I-300*, 775 F. Supp. 2d 1306, 1314 (W.D. Okla. 2010) (holding that a "career teacher's" substantive due process rights were not violated when the school board decided not to renew her contract due to concerns about her performance) (citing cases); *see also Tonkovich*, 159 F.3d at 529 (holding that a law school professor's substantive due process rights were not violated despite his allegations that the university failed to warn him that his conduct was prohibited).

Here, the District states that it terminated Ms. Hays's employment due to concerns about her unprofessional conduct and deficient performance. Even assuming that the District also terminated Ms. Hays's employment for reasons she states are "arbitrary and capricious," the District's decision to terminate Ms. Hays's employment is not so "outrageous and [of] a magnitude of potential or actual harm that is truly conscience shocking." *Tonkovich*, 159 F.3d at 528 (quoting *Uhlrig*, 64 F.3d at 574). Accordingly, the court grants summary judgment in the District's favor on Ms. Hays's substantive due process claim.

### D.   Procedural Due Process

Ms. Hays asserts that her termination violated her procedural due process rights under the Fourteenth Amendment to the Constitution. "To assess whether an individual was denied procedural due process, courts must engage in a two-step inquiry: (1) did the individual possess a protected interest such that the due process protections were applicable; and, if so, then (2) was

the individual afforded an appropriate level of process." *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1209 (10th Cir. 2007) (quoting *Montgomery v. City of Ardmore*, 365 F.3d 926, 935 (10th Cir. 2004)). "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Id.* (quoting *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)).

As discussed above, Ms. Hays meets the first of these requirements, "a protected interest." Because Ms. Hays was a "career employee," she "possessed a property interest deserving of procedural due process." *Tonkovich*, 159 F.3d at 517. And as a "tenured public employee," Ms. Hays is entitled to both pre- and post-termination hearings. *See id.* at 517–18. Ms. Hays challenges whether she was afforded the appropriate level of process in both of these hearings. Each is addressed below.

### 1.    Pre-Termination Hearing

First, Ms. Hays contends that she was afforded no pre-termination hearing. "An essential principle of due process is that a deprivation of life, liberty or property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.'" *Riggins v. Goodman*, 572 F.3d 1101, 1108 (10th Cir. 2009) (quoting *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985)). Thus, "the root requirement" of the Due Process Clause is affording an individual "an opportunity for a hearing *before* he is deprived of any significant property interest." *Id.* (quoting *Loudermill*, 470 U.S. at 542). "This principle requires 'some kind of a hearing' prior to the discharge of an employee who has a constitutionally protected property interest in his employment." *Id.* (quoting *Loudermill*, 470 U.S. at 542).

At a pre-termination hearing, "a tenured public employee is entitled to oral or written notice of the charges against [her], an explanation of the employer's evidence, and an

opportunity to present [her] side of the story." *Tonkovich*, 159 F.3d at 517 (quoting *Loudermill*, 470 U.S. at 546). For example, in *Riggins v. Goodman*, 572 F.3d 1101 (10th Cir. 2009), the Tenth Circuit held that the pretermination process was sufficient where the plaintiff was given a letter notifying him of his employer's "initial decision to terminate him, and informed him of the reasons for his termination and the basis for it," as well as a description of the procedure allowing him to contest the "proposed" termination *before* the termination became effective. *Id.* at 1109–10.

Yet the pre-termination process need not be as thorough as that conducted in *Riggins*: "A full evidentiary hearing is not required prior to an adverse employment action." *Riggins*, 572 F.3d at 1108 (quoting *West v. Grand Cty.*, 967 F.2d 362, 367 (10th Cir. 1992)). Rather, the individual "needs only to be given notice and an opportunity to respond." *Id.* (quoting *West*, 967 F.2d at 367). Thus, the Tenth Circuit has upheld "informal proceedings, such as pretermination warnings and an opportunity for a face-to-face meeting with supervisors, and even a limited conversation between an employee and his supervisor immediately prior to the employee's termination," as sufficient to satisfy due process requirements. *Id.* (citing *Seibert v. Univ. of Okla. Health Sciences Ctr.*, 867 F.2d 591, 598 (10th Cir. 1989); *Powell v. Mikulecky*, 891 F.2d 1454, 1459 (10th Cir. 1989)).

For example, in *Powell v. Mikulecky*, 891 F.2d 1454 (10th Cir. 1989), the Tenth Circuit held that the pretermination process was constitutionally sufficient "when an employee was terminated *during* a meeting after he was asked and admitted to having had unauthorized communications." *Riggins*, 572 F.3d at 1109 (discussing *Powell*, 891 F.2d at 1459). And in *West v. Grand County*, 967 F.2d 362 (10th Cir. 1992), the Tenth Circuit concluded that the employee's pretermination process was sufficient "when the totality of the circumstances indicated [the

employee] knew in advance of her termination that the county attorney proposed to eliminate her job, and she had several pretermination opportunities to discuss her potential termination with the new county attorney and other county officials." *Riggins*, 572 F.3d at 1109 (discussing *West*, 967 F.2d at 367–68). Significantly, the Tenth Circuit emphasized,

> [T]he totality of the procedures and opportunities which the [employer] afforded plaintiff were sufficient to satisfy constitutional requirements. Plaintiff was not fired out of the blue. Plaintiff was not fired for reasons that [she] did not know. Plaintiff was not fired without being given the "opportunity to present his side of the story."

*West*, 967 F.2d at 368 (quoting *Seibert*, 867 F.2d at 599).

Here, Ms. Hays contends that she was never afforded a pre-termination opportunity to be heard. Specifically, Ms. Hays contends that her 2010–2011 administrative evaluation that placed her on probationary status gave her no meaningful reasons for the District's actions, other than an instruction to rectify unspecified "negative behaviors." Further, she contends that she was never informed what level of progress she needed to achieve on Mr. Frost's Post-Consulting Survey until after her employment was terminated. Ms. Hays acknowledges that she had a meeting with Superintendent Timothy on May 3, 2012, five days before she was notified her employment would be terminated for cause. But Ms. Hays contends that at that meeting, Superintendent Timothy "made clear that he had made up his mind on [her] termination, presenting her only with the alternatives of resignation, acceptance of a reduction-in-force termination, or termination for cause." Because of this, Ms. Hays contends that she was not afforded an opportunity to respond to the charges against her, many of which she was not aware of until after her termination became effective.

Conversely, the District argues that because Ms. Hays's post-termination hearing was so "elaborate," her pre-termination hearing "did not need to be comprehensive." Further, the

District argues that Ms. Hays was "terminated for a pattern of behavior," and that Ms. Hays was warned about this behavior "when appointed as principal" and "repeatedly throughout her career." The District cites to Ms. Hays's appointment letter in which Ms. Hays was warned about her "leadership style" and given instructions on how to improve. This warning appeared again in Ms. Hays's 2008–2009 and 2010–2011 administrative evaluations. The District also argues that Ms. Hays had notice of the reasons for her termination through the low scores Ms. Hays received in various domains on her JAES evaluations, the extension of her provisional status in 2009, the anonymous comments included in her 2010–2011 administrative evaluation, and her placement on probation at the beginning of the 2011 school year. The District contends that these facts, coupled with Ms. Hays's coaching period and her scores on Mr. Frost's Post-Consulting Survey, were sufficient to notify Ms. Hays of the reasons for her termination before it became effective.

The District also contends that Ms. Hays had opportunities to be heard "at every stage of her discipline" and that Ms. Hays "failed to exercise her right to be heard." Specifically, the District contends that Ms. Hays never objected to the use of the JAES and administrative evaluations used every year. The District further argues that Ms. Hays had an opportunity to respond to the three separate incidents in which her behavior was allegedly unprofessional: the 2009 and 2010 collaboration meetings, and the December 2011 cheerleader incident. The District also asserts that Ms. Hays had an opportunity to be heard when her provisional employment status was extended for a year and when she was placed on probation. In addition, the District argues that Ms. Hays had the opportunity to respond to Superintendent Timothy's decision to terminate her employment at the May 3, 2012 meeting but that she remained silent. And finally, the District argues that Ms. Hays had the opportunity to request an informal conference with Superintendent Timothy "to discuss her departure from" the District but that she failed to take

34

advantage of this opportunity.

There are disputes of material fact as to whether the District afforded Ms. Hays an adequate pre-termination hearing. Based on the totality of the circumstances, reasonable minds could differ as to whether "the procedures and opportunities [that] the [District] afforded [Ms. Hays] were sufficient to satisfy constitutional requirements." *Id.* Although the District contends that Ms. Hays received notice of her termination throughout her tenure as principal, a reasonable jury could determine that the District's summary comments about Ms. Hays's "pattern of behavior" did not provide Ms. Hays with sufficient notice of termination.

Furthermore, in light of the additional facts that came to light at Ms. Hays's post-termination hearing—facts that Ms. Hays contends she was not aware of until after her termination became effective—as well as the District's failure to tell Ms. Hays that she needed to obtain an 8 out of 9 on Mr. Frost's Post-Consulting Survey, a reasonable jury could determine that the District did not provide Ms. Hays with "an explanation of the employer's evidence" sufficient to meet the procedural due process standard. *See Riggins*, 572 F.3d at 1108.

Finally, there are disputes of material fact as to whether Ms. Hays had "the opportunity to present [her] side of the story." *Id.* While the District argues that Ms. Hays had an opportunity to present her side of the story at her May 3, 2012 meeting with Superintendent Timothy, Ms. Hays contends that Superintendent Timothy told her that his decision had already been made. Further, the District contends that Ms. Hays failed to request an informal meeting with Superintendent Timothy before her termination became effective. Yet Ms. Hays testified that she did in fact request such a meeting and that when she actually met with Superintendent Timothy on May 24, 2012, she had no opportunity to object to her termination because Superintendent Timothy used

the meeting to discuss settlement negotiations.[4]

There are disputes of fact as to whether the District provided Ms. Hays with sufficient notice of the charges against her, an explanation of the District's evidence against Ms. Hays, and an opportunity for Ms. Hays to present her side of the story. The court therefore denies the parties' cross-motions for summary judgment on Ms. Hays's procedural due process claim.

### 2.    Post-Termination Hearing

Second, Ms. Hays argues that the post-termination hearing the District provided on August 9, 2012 deprived her of her procedural due process rights. "[A] full-blown adversarial post-termination hearing" is required "when a property interest in continued employment is at stake." *Tonkovich*, 159 F.3d at 517 (discussing the holding of *Calhoun v. Gaines*, 982 F.2d 1470, 1476 (10th Cir. 1992)). "A 'full post-termination hearing' is understood to include the right to representation by an attorney and the right to cross-examine adverse witnesses." *Id.* (quoting *Workman v. Jordan*, 32 F.3d 475, 480 (10th Cir. 1994)). In addition, the Tenth Circuit has recognized an individual's right to "notice of the charges, and of [her] accusers, well before the hearing." *Id.* at 520.

Ms. Hays argues that at the August 9, 2012 hearing, "the District raised for the first time the substance of its claims against Ms. Hays" as well as witnesses it had never before identified. And Ms. Hays contends that her post-termination hearing was insufficient because she "had no

---

[4] In connection with her reply memorandum, Ms. Hays submitted a declaration (Docket 103). In her declaration, Ms. Hays states that she "caused [her] legal counsel to contact the District and request an informal hearing," and that "[i]n response to that request, [she] received an email dated May 14, 2012, from Lorie Pearce, offering alternative dates." The District objects to Ms. Hays's declaration and argues that "it is inconsistent with Ms. Hays's deposition testimony and the documentary evidence in the record." (Docket 108). The District maintains that Ms. Hays never requested an informal conference with Superintendent Timothy.

There is a dispute of material fact as to whether Ms. Hays requested an informal meeting with Superintendent Timothy. Ms. Pearce's email lists possible dates for a meeting between Ms. Hays and Superintendent Timothy. But it does not suggest that Ms. Hays did not request the meeting. Because there is a dispute of material fact as to who requested the informal meeting and when the meeting was requested, the court OVERRULES the District's objection to Ms. Hays's declaration.

meaningful opportunity to meet or rebut [the District's] assertions" or prepare for these charges in advance. In addition, Ms. Hays argues that the District improperly prevented her expert witness from testifying.

Conversely, the District argues that the post-termination hearing on August 9, 2012 afforded to Ms. Hays was "extensive." The District further argues that at the hearing, Ms. Hays was represented by an attorney and had the right to cross-examine witness. The District also points out that when the District produced information that Ms. Hays had never before seen, the Board continued the hearing for one month so Ms. Hays could review the information. Because of this, the District contends the post-termination hearing was more than adequate.

Ms. Hays argues that despite this continuance, she was "not given sufficient advance notice of the substance of the District's claims or witnesses against her." While Ms. Hays acknowledges that she was given Superintendent Timothy's notes during the continuance, she "was not given any other information concerning testimony which would be forthcoming in the closed hearing when it reconvened."

As with Ms. Hays's pre-termination hearing, there are disputes of material fact as to whether the District provided Ms. Hays "notice of the charges, and of [her] accusers, well before the hearing." *Id.* Such notice is necessary in order for the court to determine whether Ms. Hays's procedural due process rights were violated. *Id.* And even though the hearing was continued so that Ms. Hays could obtain Superintendent Timothy's notes, there are disputes of material fact as to whether the District also gave her notice of the remainder of the charges against her and those accusing her of unprofessional conduct during this time. Such disputes preclude the court from granting summary judgment.

Because reasonable minds could differ as to whether Ms. Hays had sufficient notice of

the claims against her or of her accusers prior to her termination or post-termination hearing, the

court denies summary judgment on Ms. Hays's procedural due process claim.

In summary, the court DENIES Ms. Hays's motion for summary judgment but GRANTS

summary judgment in favor of the District on Ms. Hays's substantive due process claim. The

court DENIES the District's motion for summary judgment in all other respects.

## II.   The District's Motion to Exclude Ms. Hays's Expert Witness

The District moves to exclude Ms. Hays's expert witness, Dr. Thomas, under Federal

Rule of Evidence 702 and argues that Dr. Thomas's testimony is neither reliable nor relevant.

Under Rule 702,

> A witness who is qualified as an expert by knowledge, skill, experience,
> training, or education may testify in the form of an opinion or otherwise if:
> (a)      the expert's scientific, technical, or other specialized knowledge
> will help the trier of fact to understand the evidence or to determine a fact in
> issue;
> (b)      the testimony is based on sufficient facts or data;
> (c)      the testimony is the product of reliable principles and methods; and
> (d)      the expert has reliably applied the principles and methods to the
> facts of the case.

"Rule 702 imposes a gatekeeping function on district courts to ensure expert testimony is

admitted only if it is relevant and reliable." *Etherton v. Owners Ins. Co.*, No. 14-1164, 2016 WL

3912812, at *3 (10th Cir. July 19, 2016). "The 'help the trier of fact' language of Rule 702 is a

relevance test for expert testimony. Even if scientifically valid, the expert testimony must 'fit'—

it must relate to a disputed issue in the case." *Id.*

To determine whether expert testimony is reliable, the court must conduct a "preliminary

assessment of whether the reasoning or methodology underlying the testimony is scientifically

valid and of whether that reasoning or methodology properly can be applied to the facts in

issue." *Id.* (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592–93 (1993)). This

inquiry is "'a flexible one,' not governed by 'a definitive checklist or test,'" and allows courts to

consider factors such as "whether the expert's theory or technique (1) 'can be (and has been)

tested,' (2) 'has been subjected to peer review and publication,' (3) has a 'known or potential rate

of error' with 'standards controlling the technique's operation,' and (4) enjoys 'widespread

acceptance' in the relevant scientific community." *Atl. Richfield Co. v. Farm Credit Bank of

Wichita*, 226 F.3d 1138, 1163 (10th Cir. 2000) (quoting *Daubert*, 509 U.S. at 593–94).

But Rule 702's gatekeeping requirement and the *Daubert* factors "appl[y] not only to

testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other

specialized' knowledge." *Id.* (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999)).

"The objective of that requirement 'is to make certain that an expert, whether basing testimony

upon professional studies or personal experience, employs in the courtroom the same level of

intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Id.* (quoting

*Kumho Tire*, 526 U.S. at 152). Thus, "the trial court should consider the specific factors

identified in *Daubert* where they are reasonable measures of the reliability of expert testimony."

*Kumho Tire*, 526 U.S. at 152; *see also id.* at 150 ("[W]e can neither rule out, nor rule in, for all

cases and for all time the applicability of the factors mentioned in *Daubert*, nor can we now do

so for subsets of cases categorized by category of expert or by kind of evidence. Too much

depends on the particular circumstances of the particular case at issue.").

"The focus, of course, must be solely on principles and methodology, not on the

conclusions that they generate." *Etherton*, 2016 WL 3912812, at *3 (quoting *Daubert*, 509 U.S.

at 595). Thus, "[t]he plaintiff need not prove that the expert is undisputably correct . . . . Instead,

the plaintiff must show that the method employed by the expert in reaching the conclusion is

scientifically sound and that the opinion is based on facts which sufficiently satisfy Rule 702's

reliability requirements." *Id.* (quoting *Mitchell v. Gencorp Inc.*, 165 F.3d 778, 781 (10th Cir. 1999)).

A district court's application of Rule 702 and *Daubert* is reviewed under an abuse of discretion standard and will only be set aside if its ruling is "arbitrary, capricious, whimsical, or manifestly unreasonable or [if] . . . the district court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." *Etherton*, 2016 WL 3912812, at *2 (quoting *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1223 (10th Cir. 2003)). Thus, a district court "must adequately demonstrate by specific findings on the record that it has performed its duty as gatekeeper." *Dodge*, 328 F.3d at 1223 (quoting *Goebel v. Denver & Rio Grande W.R.R. Co.*, 215 F.3d 1083, 1088 (10th Cir. 2000)).

The District does not dispute that Dr. Thomas is qualified to testify as an expert on educational policy. Instead, the District argues that Dr. Thomas's testimony is neither reliable nor relevant. As to reliability, the District argues that Dr. Thomas's testimony "does not meet the standards required of an expert witness because he does not identify the principles, methods, or facts that have led him to his conclusions." Specifically, the District contends that Dr. Thomas's analysis of Ms. Hays's ability to meet her employment objectives fails to specify the evidence Dr. Thomas considered. The District further argues that Dr. Thomas failed to describe "the technique he employed" in determining that a score of 8 out of 9 on Mr. Frost's Post-Consulting Survey is "an extremely unlikely achievement by any individual."

As to relevance, the District contends that Dr. Thomas's testimony "is not relevant because the factual matters at issue in this case are within the trier-of-fact's common knowledge and experience." The District further argues that Dr. Thomas's conclusion that the District's actions in terminating Ms. Hays's employment "constitute[] a violation of her property rights"

40

"infringes on matters of fact and law very properly within the capabilities of the court and the jury to decide."

Conversely, Ms. Hays argues that the District "offers nothing to the court by way of countervailing evidence to suggest that Dr. Thomas' methods are unsound or his conclusions in any way suspect." Specifically, Ms. Hays argues that Dr. Thomas's testimony is relevant because it will assist the jurors in understanding what the "proper procedure applicable in the profession of educational administration" is for terminating employment "for cause." Ms. Hays further contends that Dr. Thomas's testimony is reliable because "it derives from the documentary record in this matter, to which Dr. Thomas has applied known principles of statistical analysis and ethical standards adopted by the American Association of School Administrators, and recognized generally in the profession in which he has spent his professional life." Because of Dr. Thomas's expertise in professional administrative norms, Ms. Hays contends that he can aid the jury in assessing the District's personnel practices.

Although the District vigorously contests the admission of Dr. Thomas's testimony, the court concludes that it is both reliable and relevant under Rule 702 and *Daubert*. As to reliability, Dr. Thomas bases his opinion on the record in this case, including the letter appointing Ms. Hays to the position of principal, the JAES evaluations, Mr. Frost's Post-Consulting Survey, Ms. Hays's administrative evaluation letters, and Ms. Hays's termination letter. Using this information, Dr. Thomas applies his expertise as an educator, as well as the ethical standards adopted by the American Association of School Administrators, to determine whether the District's actions were appropriate under the circumstances. Dr. Thomas also uses known principles of statistical analysis to evaluate the District's use of Mr. Frost's Post-Consulting Survey. Although the District disputes Dr. Thomas's conclusions concerning the District's

actions, such disputes are appropriate for cross-examination. *See Etherton*, 2016 WL 3912812, at

*3 ("The plaintiff need not prove that the expert is undisputably correct . . . . Instead, the plaintiff

must show that the method employed by the expert in reaching the conclusion is scientifically

sound and that the opinion is based on facts which sufficiently satisfy Rule 702's reliability

requirements." (quoting *Mitchell v*, 165 F.3d at 781)). Thus, based on Dr. Thomas's experience as

an education administrator and the nature of his testimony, the court finds Dr. Thomas's

testimony to be reliable under Rule 702.

The court also finds that, at this point in time, Dr. Thomas's testimony is relevant: it

"relate[s] to a disputed issue in the case." *Id.* Despite the District's arguments that Dr. Thomas's

testimony is not relevant because it circumvents the jury's role, Rule 704 allows for expert

opinion on the "ultimate issue" at hand. Under Rule 704(a), "An opinion is not objectionable just

because it embraces an ultimate issue." Fed. R. Evid. 704(a); *see also United States v. Dazey*,

403 F.3d 1147, 1171 (10th Cir. 2005) (holding that even if an expert's testimony "arguably

embraced the ultimate issue, such testimony is permissible as long as the expert's testimony

assists, rather than supplants, the jury's judgment"). Provided that Dr. Thomas bases his

conclusions on the application of his expertise to the facts of the case, testimony on the propriety

of the District's actions would be appropriate. But Dr. Thomas may not testify to the legal

conclusion that the District violated Ms. Hays's due process rights or exhibited "moral

weakness."

Accordingly, the court DENIES the District's motion to exclude Ms. Hays's expert

witness, Dr. Thomas, because Dr. Thomas's testimony meets the Rule 702 requirements of

relevance and reliability.

## CONCLUSION

Based on the foregoing, the court DENIES Plaintiff's Motion for Summary Judgment (Docket 78, 88), and GRANTS IN PART and DENIES IN PART Defendant's Motion for Summary Judgment (Docket 87). Specifically, the court DENIES Ms. Hays's motion for summary judgment but GRANTS summary judgment in favor of the District on Ms. Hays's substantive due process claim. The court DENIES the District's motion for summary judgment in all other respects.

In addition, the court DENIES Defendant's Motion to Exclude Expert (Docket 74), and OVERRULES Defendant's Objection to Declaration of Hilary Hays (Docket 108).

DATED September 30, 2016.

BY THE COURT:

Jill N. Parrish
United States District Judge